## RUDY *v.* AUSTIN.

### Opinion delivered April 9, 1892.

1. *Decree* pro confesso *on cross-complaint*.

   Allegations of a cross-complaint not controverted by answer are taken as confessed. Mansf. Dig., sec. 5072.

2. *When gift void as to subsequent creditors.*

   A voluntary conveyance of property by an insolvent debtor is fraudulent as to subsequent as well as existing creditors if the debtor reasonably had in contemplation the contracting of such future debt at the time the conveyance was made.

3. *Subsequent creditors—Subrogation to rights of prior creditors.*

   Where a voluntary conveyance was made in fraud of prior creditors, subsequent creditors whose means were used to pay off the prior debts will be subrogated to the rights of the prior creditors.

4. *Fraudulent conveyance—Practice in action to set aside.*

   Under the act of 1887, p. 193, which provides that only one suit shall be necessary to set aside a fraudulent conveyance, a bill was filed to cancel a deed of land to defendant from Rudy as guardian of plaintiff, the consideration of which was a debt from Rudy to defendant. *Held*, that defendant might show that plaintiff derived title from Rudy by deed in fraud of defendant's rights as a creditor ; and the latter's title will be confirmed, though Rudy dies before decree, if it does not appear that Rudy had any other creditors.

Appeal from Crawford Circuit Court in Chancery.
HUGH F. THOMASON, Judge.

This was an action instituted by John M. Rudy
against James L. Austin and Mamie B. Austin, to quiet
his title to two certain town lots in Van Buren, and for
other purposes.   Plaintiff alleged in his complaint that
Daniel H. and Mary Divilbliss conveyed the lots to him
on the 15th day of June, 1870 ; that afterwards, some-
time in the month of April, 1879, his father, George H.
Rudy, being indebted to M. Lynch, J. Neal and James
L. Austin in about the sum of five thousand dollars,
entered into an agreement with them, by which he,
George H. Rudy, promised that he, as natural guardian
of plaintiff, who was then a minor, would apply to the
probate court for an order authorizing him, as such guard-
ian, to sell the lots, and Lynch, Neal and Austin agreed
to purchase the same at such sale and take them in full
satisfaction of George H. Rudy's indebtedness to them ;
that subsequently George H. Rudy, as such guardian,
made application to the probate court for, and procured,
an order to sell the lots for the ostensible purpose of get-
ting money to rear and educate plaintiff, and for re-
investment ; and, on the 17th of May, 1879, sold the same
at public auction to the said Lynch at and for the sum of
$2000, he being the highest bidder therefor ; that Lynch
purchased and held the lots in trust for himself, Neal
and Austin, until afterwards when, Austin having pur-
chased his and Neal's interest, he conveyed the same to
Austin ; and that Austin thereafter conveyed the same,
without consideration, to his wife and co-defendant,
Mamie B. Austin ; and asked that an account be taken
of the rents received for the lots ; that the order of the
probate court be set aside ; and that his title be quieted,
and for other relief.

The defendant answered and admitted that the allegations in the complaint were substantially true, and alleged that the sale to Lynch was confirmed by the probate court, and that Austin purchased the interest of Lynch and Neal in the lots after the sale under the order of the probate court was made, and paid for the same and their interest in a small tract of land $1000 ; and answered further by way of cross-complaint, and alleged new matter, and made the plaintiff and George H. Rudy defendants therein.

Afterwards James L. Austin, and Miriam E. and Hamilton L. Austin, by their guardian and next friend, Jesse Turner, Jr., and Jesse Turner, Jr., as the executor of the last will and testament of Mamie B. Austin, deceased, filed an amended cross-complaint, in which they alleged that the defendant, Mamie B. Austin, had died since the commencement of the action and left a last will and testament, in and by which she had devised the lots in controversy to her children, the said Miriam E. and Hamilton L. Austin, and appointed Jesse Turner, Jr., executor of her will and guardian of her children, they being infants of tender years, and that he had duly qualified as such executor and guardian. That George H. Rudy had died since the filing of the original cross-complaint, intestate, leaving Alice Rudy, his widow, and John M. Rudy and his other children, naming them, his heirs, him surviving. That Alice Rudy was the duly appointed and qualified administratrix of his estate. And the plaintiffs in the amended cross-complaint made the plaintiff in the original complaint, John M. Rudy, and the administratrix and the heirs of George H. Rudy, deceased, parties defendants to their amended cross-complaint, and caused all of them to be duly served with process.

They further alleged in their amended cross-complaint substantially as follows : That George H. Rudy

purchased the lots of Divilbliss and paid for the same and caused Divilbliss and wife to convey the same to his son, John M. Rudy, a minor, being then five or six years old. That at the time of this purchase George H. Rudy was totally insolvent, without money or property, subject to execution, to pay his debts, and thereafter remained insolvent until the sale of the lots under the order of the probate court. They alleged specifically the debts which he owed at the time of the purchase, and that he had never paid them. That John M. Rudy paid nothing for the lots. That George H. Rudy caused Divilbliss and wife to convey them to him for the purpose of defrauding those who were his creditors at the time of the purchase and conveyance "and in anticipation of and reference to his subsequent indebtedness and insolvency," that is to say, to defraud subsequent creditors.

That George H. Rudy married an adopted daughter of Mrs. Olive Maxey. That Mrs. Maxey owned a valuable farm. That she permitted George H. Rudy to occupy and cultivate the same for a period of fifteen years, commencing soon after the late war between the States. That during this time he dealt largely with the merchants of Van Buren, and, although he paid them considerable sums of money out of the proceeds of the crops raised on the Maxey farm, "he was largely indebted to them all the time for goods, wares and merchandise, and for supplies furnished and money loaned." That he "dealt largely and extensively" with Lynch, Neal and Austin, merchants of Van Buren, his aggregate indebtedness to them at the time of the sale under the order of the probate court being nearly or quite $6000. That to pay this indebtedness the agreement was entered into, the order of sale was procured, the sale was made, and the lots were conveyed to Lynch, as stated in the original complaint. That the lots and improvements thereon

were only worth $2000. In consideration of these facts
they asked that all the right, title, interest, estate, and
claim of George H. and John M. Rudy, or either of them,
in and to the lots be vested in the devisees of Mamie B.
Austin, deceased, and other relief.

None of the defendants in the cross-complaint, except
the minors, answered. The cross-complaint was taken
for confessed as to John M. Rudy and all the adult
defendants, by a decree *pro confesso* entered for that
purpose.

The cause was heard and submitted upon the plead-
ings and exhibits and the decree *pro confesso* and the
depositions of witnesses.

In the depositions the following facts appear : The
business or occupation of George H. Rudy was farming.
He raised large crops ; his credit was good ; and he con-
tracted large debts. He commenced dealing with Lynch,
who was a merchant, prior to 1870, and was indebted to
him when the lots in controversy were conveyed to John
M. Rudy, and continued to deal with him until he entered
into partnership with Neal. He commenced trading with
Neal, another merchant, in 1871, and dealt with him until
1874, when he and Lynch became partners, and then dealt
with them until 1881. He commenced trading with Aus-
tin, also a merchant, in June, 1876, and dealt with him
until the close of the year 1877. He contracted large
debts with these merchants ; made large crops, and deliv-
ered the same to them on account ; and so continued to
do business up to the time he compromised, as before
stated. The agreement of George H. Rudy and Lynch,
Neal and Austin, and the performance of it, appear in
the depositions as stated in the pleadings.

A decree was rendered in accordance with the prayer
of the amended cross-complaint, and John M. Rudy
appealed.

*U. M. & G. B. Rose* for appellant.

1.   Conceding the truth of the charges of the cross-complaint, appellee can not acquire title to lands by the proceedings they have resorted to.   Austin's remedy was to bring suit against George H. Rudy, recover judgment and file a creditor's bill.

2.   There is no evidence in the record to justify the court in finding that the property should have been subjected to George H. Rudy's debts.   There is no testimony that the money was advanced by Rudy, or that he was insolvent in 1870.

3.   Rudy owed Neal, Lynch or Austin nothing at the time the deed was executed by Divilbliss to plaintiff. They extended him no credit upon the faith of its ownership.   These debts were contracted long afterwards.   If it was a gift, they were not injured.   The doctrine of tacking a new debt to an old one has been repudiated by 'this court.   42 Ark. 173; 38 Ark. 427.   The American rule is that while voluntary conveyances are fraudulent as to existing creditors, they are not *per se* fraudulent as to subsequent creditors.   There must be proof of actual or intentional fraud.   92 U. S. 183; 102 *id.* 154; 106 *id.* 264; 59 Mo. 158; 112 U. S. 144; 134 *id.* 405; 109 N. Y. 327.   The American doctrine as outlined in 42 Ark. 173 is supported by 31 Conn. 372; 65 Me. 411; 67 Me. 258; 37 Pa. St. 508; 39 *id.* 499; 79 *id.* 459; 90 *id.* 293; 95 *id.* 69; 51 Ala. 318; 60 *id.* 192; 13 Cal. 62; 60 Miss. 886; 89 Ind. 556; 11 Mo. 540; 59 Mo. 158; 79 Mo. 555; 24 Kas. 780; 8 Gray, 517.

4.   Even under the English law there is a difference between existing and subsequent creditors.   Wait, Fr. Conv. 96; Bump, Fr. Conv. (3d ed.) 324.

*Turner & Turner* for appellee.

1.   On a review of the whole testimony it seems clear that Rudy was insolvent at the time the lots were purchased.   125 U. S. 77; 16 Wall. 308.

2. Our statute makes conveyances in fraud of subsequent creditors void. Mansf. Dig. sec. 3374. An intent actually to defraud creditors is to be legally inferred from the grantor's being insolvent at the time, or greatly embarrassed, or so largely indebted that his conveyance necessarily has the effect to hinder and defraud creditors; and a voluntary conveyance made under such circumstances may be set aside by a subsequent creditor. Pom. Eq. Jur., sec. 973 ; Kerr on Fraud and Mistake, p. 207–8 ; 1 Peters, C. C. 460 ; 4 Wash. 129 ; 3 Johns. Chy. 481 ; 12 S. and R. 448 ; 4 Greenl. 195 ; 1 McCord, Ch. 518 ; 4 Des. 227 ; 3 Humph. 118 ; 3 Dev. 82 ; 1 Dana, 433. Subsequent creditors may avoid a voluntary transfer by a debtor by showing that it was made with a design to defraud the grantor's pre-existing creditors, and evidence of fraud against existing creditors is sufficient evidence of fraud against subsequent creditors. 52 Conn. 437 ; 50 Mo. 139 ; 2 Bush, 70 ; 29 Beav. 417 ; 1 Rob. (Va.) 123 ; 14 Sm. and M. 130 ; 10 N. Y. 227 ; 13 How. 92 ; 39 Minn. 527 ; 100 Mass. 524 ; 118 Mass. 524 ; 125 *id*. 398 ; 72 N. Y. 70 ; 54 Me. 476 ; 30 W. Va. 619 ; 92 U. S. 183 ; 13 Cal. 62 ; 12 Blatch. 256 ; 49 N. H. 100 ; 10 Ala. 348 ; 43 Vt. 48 ; 102 Mass. 272 ; 11 Gray, 217 ; 17 N. J. Eq. 367 ; 44 Pa. St. 413 ; 19 Md. 172 ; 2 Mackey, 43. See also 38 Ark. 425 ; 42 *id*. 173 ; 50 *id*. 43.

3. Appellees are not debarred from impeaching the conveyance by reason of the fact that they are in possession under certain illegal proceedings of the probate court. Broom's Leg. Max., secs. 685, 701 ; 45 Ark. 523 ; 30 *id*. 417 ; 22 *id*. 143 ; 33 *id*. 328 ; 14 *id*. 69.

BATTLE, J., after stating the facts as above reported.

The defendants in the cross-complaint having failed to controvert the allegations therein, the same should have been taken as true. The circuit court properly treated them as confessed. Mansf. Dig., sec. 5072.

1. Decree *pro confesso* on cross-complaint.

2. When
gift void as to
subsequent
creditors.

The conveyance of the lots in controversy by Divilbliss and wife to the appellant was virtually a conveyance by George H. Rudy to his son, John M. Rudy, the same having been purchased and paid for by the father. It was a voluntary conveyance. Was it void as to the creditors of Rudy?

A debtor has the right to make reasonable provisions in property for his wife or children, according to his state and condition in life. But in doing so he must retain in his possession property amply sufficient to pay all his debts. If he does so fairly and honestly, the child or wife for whom the provision was made is not bound to refund the advancement, for the benefit of creditors, in the event the parent or husband should subsequently fail or become unable to pay the debts he owed when the provision was made. *Bertrand* v. *Elder*, 23 Ark., 494.

The law requires every man to be just before he is generous. If he makes a voluntary conveyance while he is in debt, it presumes that it is fraudulent as to existing creditors, and the burden is on those claiming under the conveyance to repel the presumption. If he be insolvent, unable to pay his debts, the presumption that it is fraudulent as to antecedent creditors is conclusive. The rule is correctly stated in *Driggs* v. *Norwood*, 50 Ark. 46, as follows : " Every voluntary alienation of his property by an embarrassed debtor is presumptively fraudulent against existing creditors. Indebtedness raises a presumption of fraud, which becomes conclusive upon insolvency. But as to subsequent creditors, a voluntary conveyance by a person in debt is not *per se* fraudulent. To make it so, proof of actual or intentional fraud is required."

According to the uncontroverted allegations of the cross-complaint George H. Rudy was unquestionably insolvent; and the conveyance to his son was void as to existing creditors. Was it void as to subsequent creditors?

Against subsequent creditors a voluntary conveyance executed by a grantor in debt at the time is not void, unless actually fraudulent. To make it fraudulent proof of actual or intentional fraud is required. As to what will be sufficient proof of such fraud the authorities are obscure and conflicting.

In order for a subsequent creditor to avoid a voluntary conveyance it is not sufficient to show that there are "debts still outstanding, which the grantor owed at the time he made it," as held in *Toney* v. *McGehee*, 38 Ark. 427. Mere indebtedness is no evidence of fraud as to such creditors. But the insolvency of the grantor at the time of the conveyance is at least *prima facie* evidence of a fraudulent intent as to them, "because a transfer of property under such circumstances affords a reasonable ground of presumption that the intention with which it was made was to put beyond the reach of creditors, future as well as present, the property to which they had a right to resort for the payment of their debts." This presumption would necessarily arise if the grantor contracted debts immediately or so soon thereafter as to show that he reasonably had in contemplation the contracting of such debts at the time the transfer was made. From his inability to pay and the voluntary alienation the conclusion would naturally follow that he did not intend to pay such debts when they were contracted, and that the conveyance of the property was intended to delay or prevent the collection thereof by the sale of the property under due process of law. *Winchester* v. *Charter*, 12 Allen, 606 ; *Winchester* v. *Charter*, 97 Mass. 140 ; *Morrill* v. *Kilner*, 113 Ill. 318, 322 ; *Moritz* v. *Hoffman*, 35 Ill. 553 ; *Taylor* v. *Coenen*, 1 Ch. Div. (L. R.) 636, 641; *Reade* v. *Livingston*, 3 Johns. Ch. 501, 502 ; *Redfield* v. *Buck*, 35 Conn. 328, 337 ; *Ridgeway* v. *Underwood*, 4 Wash. C. C. 137 ; *Howe* v. *Ward*, 4 Greenl. (Me.) 195, 206 ; *Sexton* v. *Wheaton*, 8

Wheat. 229, 252 ; *Horn* v. *Volcano Water Company*, 13 Cal. 71–2 ; Bump on Fraudulent Conveyances (3d ed.), p. 322 ; 2 Bigelow on Frauds, pp. 99, 181, 200 ; May on Fraudulent Conveyances, p. 75; 1 American Leading Cases (5th ed.), 42 ; 2 Pomeroy's Equity Jurisprudence, sec. 973.

This case is a fair illustration of the rule. At the time of the execution of the conveyance in question George H. Rudy was insolvent; his liabilities far exceeded his ability to pay. His vocation was farming. He had been engaged in that business for many years previous to the execution of the deed by Divilbliss and wife, and continued to farm many years thereafter. He had no other occupation, so far as is shown by the evidence. In following his vocation he purchased, extensively, goods, wares, merchandise and supplies needed to support his family and in his farming operations, on a credit, from merchants in Van Buren. He made large crops, and, when gathered, delivered them to the merchants to whom he was indebted to be appropriated to the payment of his accounts. His crops would fall far short of paying his debts, and the result was he continued to farm and contract debts and pay them in this manner every year, so far as the proof shows, using the crops of one year to pay the debts contracted in the preceding year and the current year, so far as they would extend, and was always in debt with his merchants. In this way he did business with Lynch prior to and at the time of the execution of the deed to appellant; and was in debt to him when the lots in controversy were conveyed to his son. In this way he continued to do business with him until he became a partner of Neal. In 1871, a short time after the execution of the deed in question, he commenced buying of Neal, and in this way purchased from him and delivered crops on account until 1874, when he and Lynch became partners, and in this

way did business with them until 1881. And in this way commenced business with Austin in 1876, and did business with him in the years 1876 and 1877. His habits and necessities of business were such as to plainly show that he, at the time he caused the lots to be conveyed to his son, necessarily had in view and knew that he would contract debts in the manner he did, and that his intention, in procuring the execution of the deed to his son, was to put beyond the reach of his creditors, antecedent and subsequent, the lots in controversy and to deprive them of the right to appropriate them by due process of law to the payment of his indebtedness. He could not reasonably have had any other motive. His son was about six years old, and there was no occasion for making any such provision at that time. All these facts go to prove the uncontroverted allegation of the cross-complaint that·.he caused the deed to be made to the appellant in order to defraud his existing creditors "and in anticipation of and reference to his subsequent indebtedness and insolvency"—to defraud his subsequent creditors.

In paying the debt which he owed to Lynch, at the time of the execution of the deed to his son, he did so by contracting another with Lynch and Neal in lieu of it, and thus continued to pay one by contracting another until he contracted the indebtedness of $6000, in the payment of which he attempted to convey the lots in controversy, by authority of the probate court. In this way Lynch and Neal, if not Austin, became subrogated to the right Lynch had to treat the conveyance in question as fraudulent (he being a creditor at the time it was ·executed), and to have the same set aside; became entitled to the same rights as those of the creditors whose debts their means have been used to pay. *Barhydt* v. *Perry*, 57 Iowa, 416, 419; *Madden* v. *Day*, 1 Bailey, 337, 587; *Mills* v. *Morris*, Hoffman, 419; *Brown* v. *McDonald*, 1

3. When subsequent creditor subrogated to right of prior creditor.

Hill, Ch. 297, 304 ; *Savage* v. *Murphy*, 34 N. Y. 508 ; *Churchill* v. *Wells*, 7 Cold. 364 ; *Wilson* v. *Buchanan*, 7 Gratt. 334 ; *Paulk* v. *Cooke*, 39 Conn. 566, 572 ; *Anon*, 1 Wall. Jr. 107 ; *Creed* v. *Lancaster Bank*, 1 Ohio St. 1 ; Bump on Fraudulent Conveyances (3rd ed.), p. 322 ; Wait on Fraudulent Conveyances (2d ed.) 103 ; American Leading Cases (5th ed.) 44.

Our conclusion is, that the conveyance to the appellant was fraudulent, and can be so treated by the creditors in this action. Acts of 1887, p. 193.

4. Practice as to setting aside fraudulent conveyances.

As it does not appear that George H. Rudy had any creditors at the time of his death, except Lynch, Neal and Austin, and the lots in controversy are not worth exceeding $2000, and as the indebtedness, in satisfaction of which the same were sold, amounted to $6000, exclusive of interest, and as it is to the interest of Rudy's estate and heirs that the contract of Rudy and his creditors, and the sale made in conformity therewith, should be permitted to stand, and as the conveyance to John M. Rudy is fraudulent and void, and he concedes that, this being true, he has no further interest in this cause, and has no objection to any course that this court may take in appropriating the lots in controversy to the payment of his father's debts, we decline entering into the consideration of what the proper practice as to the disposal of the lots is, and, no one concerned, under the circumstances, objecting, affirm the decree of the circuit court.

Affirmed.

Hemingway, J., did not sit in this case.